IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

HOLLY DONAHUE,                          )
            Plaintiff,               )
                                )
          vs.                          )       Civil Action No. 05-795
                                )       Chief Judge Donetta W. Ambrose
METROPOLITAN LIFE INSURANCE        )       Magistrate Judge Robert C. Mitchell
COMPANY,                                )
            Defendant.               )

REPORT AND RECOMMENDATION

I.     Recommendation

       It is respectfully recommended that the motion for summary judgment submitted on

behalf of the defendant (Docket No. 25) be granted.  It is further recommended that the motion

for summary judgment submitted on behalf of the plaintiff (Docket No. 27) be denied.  It is

further recommended that the Motion to Strike Exhibits Submitted With Plaintiff's Motion for

Summary Judgment, submitted on behalf of the defendant (Docket No. 36), be denied.

II.    Report

       Plaintiff, Holly Donahue, brings this action against Defendant, Metropolitan Life

Insurance Company ("MetLife"), asserting claims under the Employee Retirement Income

Security Act of 1974, 29 U.S.C. §§ 1100-1145 (ERISA), arising out of Defendant's refusal to pay

Accidental Death or Dismemberment ("AD&D") benefits to her following the death of her

husband, Dennis Donahue, on June 18, 2002.

       Presently before this Court for disposition are cross-motions for summary judgment and

Defendant's motion to strike certain exhibits submitted by Plaintiff in connection with her

motion for summary judgment.  For the reasons that follow, Defendant's motion to strike should

be denied, Plaintiff's motion for summary judgment should be denied and Defendant's motion for summary judgment should be granted.

Facts

Dennis Donahue was an employee of Westmoreland Regional Hospital ("Westmoreland") and was a participant in Westmoreland's Employee Benefit Plan ("the Plan"), which was underwritten through a group life policy issued by MetLife.  (Docket No. 32 at 1-47, 133.)  The Plan provided that, in the event of an accidental death, MetLife would pay an AD&D benefit in addition to the life benefit, in an amount equal to the life benefit.  (Id. at 15-17.)  The Plan specifically provided that:

> We will pay Accidental Death or Dismemberment Benefits for a Covered Loss shown in Section C if you are injured in an accident which occurs while you are covered for Accidental Death or Dismemberment Benefits; and if:
> 1.     that accident is the sole cause of the injury; and
> 2.     that injury is the sole cause of that Covered Loss.

(Id. at 15.)  The Exclusions stated that MetLife would not pay for a Covered Loss "if it in any way results from, or is caused or contributed to by: 1. Physical or mental illness, diagnosis of or treatment for the illness."  (Id. at 16.)

As summarized by the autopsy, the following sequence of events led to Mr. Donahue's death:

> The patient was a 59-year-old white male with a medical history of diabetes mellitus, chronic active hepatitis, Coomb's negative hemolytic anemia, chronic thrombocytopenia, asthma, and an intrapulmonary shunt requiring continuous oxygen therapy.  He was on the liver transplant list at University of Pittsburgh Medical Center secondary to suspected cirrhosis.  He presented to Westmoreland Regional Hospital on June 10, 2002 with the complaints of nausea, vomiting, generalized weakness, and lightheadedness after eating lunch.  His oral intake had been decreased for the past month and he lost approximately 4 pounds over that period of time.  The patient was admitted to Westmoreland Regional Hospital with the diagnosis of weakness secondary to end stage liver disease.  He was

2

doing well until the evening of June 12, 2002 when he fell from his bed and hit his head. A CT scan revealed a left cerebellar hemorrhage.

Mr. Donahue was then life flighted to Allegheny General Hospital (AGH) for evacuation of his cerebellar hematoma. On June 12, 2002, he underwent a suboccipital craniotomy for evacuation of a 5 cm cerebellar hematoma. The patient did well immediately post-operative. Post-op CT scan revealed hydrocephalus with increased ventricular size. An external ventricular drain (EVD) catheter was placed to drain the excess cerebral spinal fluid. On June 13, 2002, the patient became less responsive and blood was draining from the EVD catheter. A CT scan then showed cerebral edema and reaccumulation of blood in the cerebellum. The surgical term emergently took the patient back to the operating room for a second suboccipital craniotomy for evacuation of cerebellar hematoma. The patient continued to bleed intracranial. The patient also began to bleed from other sites due to coagulopathy. Studies discovered that Mr. Donahue was bleeding from his stomach, upper gastrointestinal tract and bladder, in addition to his brain. He then developed respiratory failure with possible pneumonia. His prognosis was deemed grim. Mr. Donahue's family decided to withdraw[] all life support measures given the grim prognosis. Mr. Dennis Donahue was pronounced dead on Tuesday June 18, 2002 at 10:50 a.m.

(Id. at 101.) The autopsy concluded that "Mr. Dennis Donahue died as a result of a cerebellar/tonsillar herniation secondary to an intracranial hemorrhage. Other contributing factors to his demise were his poor liver function with underl[y]ing coagulopathy and his acute bilateral bronchopneumonia." (Id. at 102.)

The original Certification of Death, dated June 21, 2002, noted that the manner of death was "natural" and stated that the immediate causes were cardiopulmonary arrest, multisystem organ failure, liver failure and cerebellar hemorrhage. (Id. at 119.) A second Certificate of Death, issued on March 25, 2004, states that the death was accidental and notes that the cause of death was "cerebellar hemorrhage" caused by "blunt force trauma of head." The date of injury is given as June 12, 2002 and the description of the injury is "fell to floor." In the box labeled "Other significant conditions contributing to death, but not resulting in the underlying cause" is the phrase "liver failure." (Id. at 136.)

3

On July 3, 2002, Westmoreland submitted an application for Plaintiff to receive basic life benefits because of Mr. Donahue's death. (Id. at 130-31.) Mary Harrison, a benefits specialist with Westmoreland, states that she checked only the box for basic life insurance, and not the box for AD&D benefits, because she had called MetLife and was told to mark the form according to the death certificate, which listed natural causes. (Harrison Dep. at 7; Dep. Ex. 5.)[1] Her supervisor, Laurie English, Director of Human Resources for Westmoreland, confirmed that this was the process MetLife had followed in other cases as well. (English Dep. at 16.)[2] On July 23, 2002, MetLife paid the regular death benefit under the Plan in the amount of $84,500.00. (Docket No. 32 at 123-24, 127.)

On June 12, 2003, a MetLife representative named Mary Rapsky wrote an email message to Laurie English, stating that: "What needs to be done at this point is for the attorney to send in a letter of appeal within 60 days of the denial letter." (Dep. Ex. 2.) This appears to be a response to an inquiry made by Laurie English about the appeal process, but the question posed to Mary Rapsky is not in any of the documents submitted.

That same day, Plaintiff's counsel, Craig Frischman, wrote the following in a letter to MetLife:

> By letter dated May 6th, I corresponded with Westmoreland Regional Hospital concerning our request for double indemnity benefits as a result of the accidental death of Mrs. Donahue's husband, Dennis Donahue. To date, neither Mrs. Donahue nor our office have ever received a formal denial concerning Mrs. Donahue's request for double indemnity life insurance benefits. To the extent that

---

[1]    Mary Harrison's deposition is attached to Docket No. 29 at Exhibit B. All of the exhibits to the depositions are attached to Docket No. 29 at Exhibit E. Although MetLife moves to strike the depositions and exhibits, its motion should be denied for the reasons explained below.

[2]    Docket No. 29 Ex. C.

4

your call which we received earlier today constitutes a denial of Mr. Donahue's benefits, please consider this letter our formal notice of appeal from the denial of the same.  To the extent that further documentation is required, please forward the same to my attention so that I can promptly complete the same.

(Docket No. 32 at 121.)  MetLife responded on June 26, 2003 that it had not denied a claim, because Westmoreland had not submitted one:  "Until we receive a claim for these benefits, we may not process or deny the benefit."  (Id. at 120.)  Attorney Frischman wrote a second letter on July 1, 2003, indicating that he wished to appeal MetLife's denial of Plaintiff's claim for AD&D benefits and wanted to know the steps necessary to do so.  (Id. at 116.)  MetLife responded on July 10, 2003 to indicate that "[s]ince we have not gotten a claim for this benefit we have not reviewed it and paid or denied any benefit.  We first need a claim from the employer before processing this benefit.  Please contact the employer to file a claim then we shall review AD&D benefits."  (Id. at 115.)  On August 13, 2003, Attorney Frischman wrote another letter to MetLife, stating as follows:

> By letters dated June 12th and July 1st, I corresponded with you concerning the above-referenced claim.  To date, I have not received a courtesy of a response.  Given the manner in which Mr. Donahue died, I am at a loss to understand how his widow is not entitled to double indemnity death benefits.  Unfortunately, I believe that your lack of response to a legitimate claim for double indemnity death benefits rises to the level of bad faith.
>
> I would greatly appreciate it if a representative of MetLife would immediately contact me upon receipt of this letter to discuss MetLife's position in further detail.

(Id. at 112.)

On September 5, 2003, Tim Copperwheat of MetLife received a call from Laurie English, in which she advised MetLife that Westmoreland could not submit a claim for AD&D benefits because Attorney Frischman was claiming that Mr. Donahue fell from his hospital bed due to

Westmoreland's negligence and filing a claim for AD&D benefits could be construed as an admission of liability.  (Id. at 92.)[3]

On September 8, 2003, Laurie English wrote an email message to Carol Bucci, Chief Legal Officer and General Counsel for the parent company to Westmoreland, stating as follows:

> I have been trying to reach you to let you know that the attorney for Dennis Donahue's wife, Craig Frischman called Friday September 5, 2003 regarding the payment of MetLife accidental death benefits of $84,500.  I returned his call and he stated that when he spoke to Tim Copperwheat at MetLife he was informed that they cannot process an accidental death benefit unless we submit the paperwork that it was an accident.
>
> Originally when Mary Harrison completed the paperwork for his life insurance she called MetLife and asked how to submit the claim.  The representative told Mary that they needed a copy of the death certificate and that since the death certificate stated "natural causes" that she should not check the accident box for double payment.  Only a life claim was filed for $84,500.
>
> According to Craig Frischman he has paperwork from the autopsy showing death due to head trauma from falling out of bed which is accidental.
>
> When I spoke to Tim Copperwheat he told me that we need to submit paperwork stating it was accidental death and with the support Craig can provide they would look at processing the claim.

(Dep. Ex. 8.)  Carol Bucci responded that MetLife "asked for the death certificate and that is what we gave them.  I don't believe we have even seen the autopsy report or knew there was one done.  I wonder if they had benefit of our radiologists [sic] report."  (Id.)

On September 8, 2003, Attorney Frischman wrote to Tim Copperwheat at MetLife to confirm a conversation they had the previous Friday, September 5:

---

[3]      Attorney Frischman states that his investigation led him to conclude that Dennis Donahue's bed slipped from underneath him when he got up to urinate and that the reason the bed slipped was that a nurse had failed to lock the wheels on his bed after moving him a few hours earlier.  (Frischman Aff. ¶ 4, Docket No. 29 Ex. A.)

Based upon our conversation, it is my understanding that the claim has to be submitted by Mr. Donahue's former employer, Westmoreland Regional Hospital.  Subsequent to our telephone conversation, I spoke with Laurie English, Westmoreland Regional Hospital's Human Resources Director, concerning this very issue.  By copy of this letter to Ms. English ... I am asking that the two of you make sure that you speak so that Mr. Donahue's claim for double indemnity accidental death and dismemberment benefits is filed.  As part of your investigation of this claim, I will be enclosing with the hard copy of this letter a copy of the report from Mr. Donahue's Autopsy confirming that his death was the result of blunt force trauma to the head.  Under the circumstances, I am at a loss to understand how Mrs. Donahue is not entitled to the double indemnity benefits.

(Docket No. 32 at 110; see also id. at 93.)

On October 6, 2003, MetLife wrote to Attorney Frischman, confirming receipt of the autopsy report he submitted and acknowledging his request that MetLife speak with Westmoreland to process a claim for AD&D benefits.  The letter indicated that "the manner of death is still listed as natural causes on the death certificate.  The autopsy report currently does not change this." (Id. at 97.)  The letter further stated that:

It is also our understanding that you are pursuing legal action against the hospital/employer for his death and for it to be ruled accidental.  Due to the circumstances the employer can not submit a claim for accidental death benefits when the manner of death is listed as natural causes.  We must therefore await the outcome of any correspondence between you and Westmoreland Hospital.  Should the end result be the manner of his death [is] ruled accidental we will then pursue accidental benefits with the employer.

(Id.)

On November 6, 2003, Laurie English wrote to Carol Bucci that she had spoken to MetLife:

According to them they will only change the benefit for accidental death if the death certificate states it.  They have not addressed my letter because it was no different determination [sic] from the letter they had sent to us right before hand.

They stated that if it goes to court and it is ruled accidental that the death certificate could be changed to state reason of [sic] accidental instead of natural

causes.

> They go by the death certificate according to Jackie.  Timothy Copperwheat wasn't available to speak to.

> That is what they had told Mary Harrison originally when she was completing the application.

(Dep. Ex. 4.)

On March 4, 2004, Plaintiff entered into a settlement agreement with Westmoreland in resolution of:

> any and all actions, causes of action, claims or demands, of whatever kind or nature of any known or unknown injuries, losses or damages allegedly sustained by me, by Dennis Donahue, by the Estate of Dennis Donahue, or by any beneficiary of the Estate of Dennis Donahue, and related in any way to any care, treatment, action or inaction relating to Dennis Donahue while a patient at Westmoreland Regional Hospital in June 2002, including those injuries, losses or damages for which I, or Dennis Donahue or the Estate of Dennis Donahue [have] or could have commenced an action at law.

(Dep. Ex. 10 at 1.)

In connection with this settlement, Plaintiff signed a Full and Final Release that indicated that she was to receive the sum of $200,000, to be composed of $90,000 from Westmoreland's professional liability carrier, approximately $25,000 from Westmoreland itself and $84,500 from MetLife in payment of the AD&D benefit.  MetLife was not a party to this settlement agreement.

By order dated March 9, 2004, the Court of Common Pleas of Indiana County, Pennsylvania discontinued Plaintiff's death claim against Westmoreland.  (Compl. ¶ 24 & Ex. D.)  Plaintiff then forwarded to MetLife the amended Certificate of Death "in support of her claim for accidental death benefits."  (Compl. ¶ 25.)

However, it was not until April 15, 2004 that Westmoreland actually submitted the claim for AD&D benefits.  (Docket No. 32 at 90-91.)  On May 20, 2004, MetLife wrote to Plaintiff

acknowledging receipt of her claim for AD&D benefits and stating that it would evaluate it.  (Id. at 77-78.)

On July 21, 2004, MetLife sent a letter to Attorney Frischman notifying him that the claim was being denied.  (Id. at 65-67.)  The letter stated that:

> ADD benefits are payable only if an accident was the sole cause of the injury that caused the death under the terms of the Plan.  You have informed us that you believe that the decedent was so ill that he should have been restrained in his bed to keep him from falling out, and that the failure to do so was medical malpractice, which ultimately resulted in his death.  Under federal common law, a death that results from medical malpractice is not "accidental" for purposes of ADD coverage.  Senkier v. Hartford Life & Accident Ins. Co., et al., 948 F.2d 1050, 1053-54 (7th Cir. 1991).

> Even if the death did not result from medical malpractice, the information in the file reflects that the death was not solely caused by the injury the decedent sustained in the fall, as is required under the terms of the Plan.  The file reflects that but for the decedent's poor liver function and coagulopathy, medical intervention would have been able to stop his intracranial bleeding.

> In addition, based on the information in our file, the death resulted from, or was caused or contributed to by the decedent's end stage liver disease.

(Id. at 66-67.)

By letter dated August 2, 2004, Attorney Frischman appealed MetLife's decision.  (Id. at 58-60.)  On November 4, 2004, MetLife responded by letter indicating that it was denying the appeal.  (Id. at 139-41.)  MetLife stated that "[t]he Autopsy Report and the Replacement Certificate of Death are clear that the injuries decedent sustained in the fall were not the sole cause of death, but rather that decedent's liver disease and coagulopathy contributed to his death."  (Id. at 140.)  MetLife sought no independent medical examination or other review by a medical professional, and none is reflected in the administrative record.  (Def.'s Resp. Pl.'s First

Set Interrog. No. 6; Def.'s Resp. Pl.'s First Set Req. Admis. No. 5.)[4]

Procedural History

Plaintiff filed this action on June 9, 2005.  In Count I, she alleges that Defendant improperly denied her request for AD&D benefits in violation of 29 U.S.C. § 1132(a)(1)(B).  She also alleges that Defendant breached its fiduciary duties to her (Count II) and that it is equitably estopped from denying her claim (Count III), in violation of § 1132(a)(3)(B).

On February 17, 2006, the parties filed cross-motions for summary judgment.  On February 28, 2006, Defendant filed a motion to strike certain exhibits submitted with Plaintiff's motion for summary judgment.

Motion to Strike

MetLife moves to strike the following exhibits from Plaintiff's Appendix: 1) the affidavit of Craig Frischman (Exhibit A), in which he describes events that occurred during the attempt to obtain AD&D benefits; 2) the depositions of Mary Harrison (Exhibit B), Laurie English (Exhibit C) and Carol Bucci (Exhibit D), all representatives of Westmoreland; 3) the exhibits to these depositions (Exhibit E); and 4) a letter from MetLife's counsel to Plaintiff's counsel (Exhibit H), advising her of a clerical error in omitting the November 4, 2004 letter from the Administrative Record.

In Mitchell v. Eastman Kodak Co., 113 F.3d 433 (3d Cir. 1997), the Court of Appeals stated that: "To determine whether [the claimant] has carried his burden [to prove total disability], we look to the record as a whole.  Under the arbitrary and capricious standard of review, the 'whole' record consists of that evidence that was before the administrator when he

---

[4]      Docket No. 29 Exs. F, G.

made the decision being reviewed." Id. at 440 (citations omitted).  The court has also

approvingly cited the following principal: "In effect, a curtain falls when the fiduciary completes

its review, and for purposes of determining if substantial evidence supported the decision, the

district court must evaluate the record as it was at the time of the decision." Kosiba v. Merck &

Co., 384 F.3d 58, 69 (3d Cir. 2004) (quoting Sandoval v. Aetna Life & Cas. Ins. Co., 967 F.2d

377, 381 (10th Cir. 1992)), cert. denied, 125 S.Ct. 2252 (2005).  See also Abnathya v. Hoffman-

LaRoche, Inc., 2 F.3d 40, 48 n.8 (3d Cir. 1993) (refusing to permit plaintiff to expand the record

by submitting three additional medical evaluations that were not completed until after the final

decision to discontinue benefits was rendered).

     However, Plaintiff is not trying to introduce medical reports that postdate the decision

denying her claim for benefits.  Rather, she is trying to introduce records of events that occurred

during the review process that MetLife did not include in its Appendix.  MetLife cites no

authority that would preclude the Court from reviewing these records.

     Moreover, the Mitchell case explicitly stated that the scope of the record would be limited

to the administrative record in an "arbitrary and capricious" case and, as discussed below,

MetLife's dual role as both plan administrator and claims payer places it in a conflict of interest

and subjects its decisions to a heightened standard of review.  See Kosiba, 384 F.3d at 67 n.5

("when a court is deciding what standard of review to employ–arbitrary-and-capricious review,

or some higher standard under Pinto–it may consider evidence of potential biases and conflicts of

interest that is not found in the administrator's record.")  Finally, with respect to Plaintiff's

breach of fiduciary duty claim, Plaintiff argues that it is entitled to de novo review which is not

limited to the documents before the claims processor.  Moench v. Robertson, 62 F.3d 553, 565

(3d Cir. 1995); Luby v. Teamsters Health, Welfare & Pension Trust Fund, 944 F.2d 1176, 1184-85 (3d Cir. 1991).  Therefore, Defendant's motion to strike should be denied.

Summary Judgment Standard of Review

Summary judgment is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Woodside v. School Dist. of Philadelphia Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001) (quoting Foehl v. United States, 238 F.3d 474, 477 (3d Cir. 2001) (citations omitted)). In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor.  Doe v. County of Centre, PA, 242 F.3d 437, 446 (3d Cir. 2001); Woodside, 248 F.3d at 130; Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing'–that is, pointing out to the District Court–that there is an absence of evidence to support the non-moving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Count I – Breach of Contract

ERISA provides that a civil action may be brought:

(1) by a participant or beneficiary–

. . .

> (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

29 U.S.C. § 1132(a).

Defendant argues that Plaintiff has not demonstrated that it acted arbitrarily and capriciously and therefore the decision denying her claim for AD&D benefits should be affirmed. Plaintiff contends that Defendant's decision should be evaluated under a heightened standard of review, that Defendant wrongfully denied the claim because of the existence of underlying disease and that it demonstrated procedural irregularities, including ignoring her requests to learn the procedures for filing an appeal and to provide additional information and allowing the same person who made the initial determination to decide the appeal.

<u>Standard of Review for ERISA Benefits Denials</u>

In 1989, the Supreme Court resolved a conflict among the courts of appeals as to the appropriate standard of review in actions brought under § 1132(a)(1)(B) to review a denial of benefits:

> [T]he validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of the terms in the plan at issue. Consistent with established principles of trust law, we hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

<u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989). When the plan gives the administrator discretionary authority, the court should apply an "arbitrary and capricious" standard of review, and the decision "will be overturned only if it is 'clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by

13

the plan.'" Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc., 222 F.3d 123, 129 (3d Cir. 2000) (quoting Abnathya, 2 F.3d at 41).

In Pinto v. Reliance Standard Life Insurance Co., 214 F.3d 377 (3d Cir. 2000), the Court of Appeals held that "when an insurance company both funds and administers benefits, it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review." Id. at 378. In addition, the court has held that an employer-fiduciary may be subject to a conflict of interest requiring heightened scrutiny when its plan is "unfunded," that is, when it pays benefits out of operating funds rather than from a separate ERISA trust account. Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health & Welfare Plan, 298 F.3d 191, 197-98 (3d Cir. 2002). Finally, the court has noted other circumstances in which a heightened standard of review will be appropriate. For example, when an administrator has "demonstrated procedural irregularity, bias, or unfairness in the review of the claimant's application for benefits," a heightened standard of review may be triggered. Kosiba, 384 F.3d at 64.

The plan expressly states that:

In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(Docket No. 32 at 22.) MetLife admits that it both administers and pays benefits from its own funds, but contends that this fact is insufficient to apply a heightened standard of review. However, its citations do not support its argument.

14

As the Court of Appeals noted in Kosiba, "[w]hile Pinto addressed the case of an *insurer* both making benefits determinations and paying claims, it did not definitively decide whether any form of heightened review applies to *employers* both making benefits determinations and paying claims."  384 F.3d at 65 (emphasis added).  See also McLeod v. Hartford Life & Accident Ins. Co., 372 F.3d 618, 623 (3d Cir. 2004).  MetLife is an insurer and thus this case is governed by Pinto.

In Pinto, the court stated that to apply this heightened standard of review, courts should "apply the arbitrary and capricious standard, and integrate conflicts as factors in applying that standard, approximately calibrating the intensity of our review to the intensity of the conflict." 214 F.3d at 393.  However, the Court of Appeals has also held that

> a court may not substitute its own judgment for that of plan administrators under either the deferential or heightened arbitrary and capricious standard.  Even under the heightened standard, "a plan administrator's decision will be overturned only if it is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan."

Stratton v. E.I. DuPont de Nemours & Co., 363 F.3d 250, 256 (3d Cir. 2004) (quoting Smathers, 298 F.3d at 199).

Applying the Standard of Review

Plaintiff argues that "MetLife denied the benefit because of the existence of underlying disease."  (Pl.'s Br. Supp. Mot. Summ. J. at 10.)[5]  Defendant responds that this is an inaccurate recounting of what occurred.

As noted above, the Plan provides for AD&D benefits if an accident is the sole cause of the injury and that injury is the sole cause of the death, and the exclusions state that AD&D

_____

[5]      Docket No. 30.

benefits do not apply if the death "in any way results from, or is caused or contributed to by: 1. Physical or mental illness, diagnosis of or treatment for the illness." (Docket No. 32 at 16.) The autopsy concluded that "Mr. Dennis Donahue died as a result of a cerebellar/tonsillar herniation secondary to an intracranial hemorrhage. Other contributing factors to his demise were his poor liver function with underl[y]ing coagulopathy and his acute bilateral bronchopneumonia." (Id. at 102.) The original death certificate erroneously stated that the manner of death was "natural" but indicated that the immediate causes were cardiopulmonary arrest, multisystem organ failure, liver failure and cerebellar hemorrhage. (Id. at 119.) The replacement death certificate states that the death was accidental and notes that the cause of death was "cerebellar hemorrhage" caused by "blunt force trauma of head," but also notes that a "significant condition[] contributing to death, but not resulting in the underlying cause" was "liver failure." (Id. at 136.)

> In its decision denying Plaintiff's claim for AD&D benefits, MetLife stated that:
>
> Even if the death did not result from medical malpractice, the information in the file reflects that the death was not solely caused by the injury the decedent sustained in the fall, as is required under the terms of the Plan. The file reflects that but for the decedent's poor liver function and coagulopathy, medical intervention would have been able to stop his intracranial bleeding.
>
> In addition, based on the information in our file, the death resulted from, or was caused or contributed to by the decedent's end stage liver disease.

(Id. at 66-67.) In its decision on appeal, MetLife stated that "[t]he Autopsy Report and the Replacement Certificate of Death are clear that the injuries decedent sustained in the fall were not the sole cause of death, but rather that decedent's liver disease and coagulopathy contributed to his death." (Id. at 140.)

Thus, contrary to Plaintiff's contention, MetLife did not deny her claim on the ground that Mr. Donahue had an underlying disease. Rather, it denied the claim on the ground that his

death, although accidental, was contributed to by liver failure which occurred because of his liver disease, a physical illness.  Plaintiff cites a case holding that "once a claimant makes a *prima facie* showing of disability through physicians' reports ... and if the insurer wishes to call into question the scientific basis of those reports ... then the burden will lie with the insurer to support the basis of its objection."  Lasser v. Reliance Standard Life Ins. Co., 344 F.3d 381, 391 (3d Cir. 2003), cert. denied, 541 U.S. 1063 (2004).  However, the reports Plaintiff submitted–the autopsy report and the second death certificate–did not make a prima facie showing that Mr. Donahue's death was not contributed to by his liver failure.  Rather, both documents specifically indicated that liver failure was a contributing factor in his death.  Thus, MetLife did not bear the burden of supporting the basis of its objection to the reports because it did not reject them.  In addition, MetLife did not need to undertake any medical review because the very documents Plaintiff submitted stated that Mr. Donahue's liver failure was a contributing factor in his death.

Plaintiff cites Fegan v. State Mutual Life Assurance Co. of America, 945 F. Supp. 396 (D.N.H. 1996).  In that case, the insured injured his knee in an accident and had arthroscopic surgery performed on it.  Later, Fegan developed phlebothrombosis, a relatively rare complication of the surgery which caused fatal bilateral pulmonary emboli to develop.  The condition was not caught because of malpractice and Fegan died.  The policy provided for the payment of AD&D benefits when an insured sustained an injury while covered for the benefit, solely as a result of the injury the insured suffered a specific loss and the loss occurred within 90 days of the injury.  The policy also contained an exclusion for any loss that "directly or indirectly results from ... physical or mental illness."  The insurer denied AD&D benefits, citing the "sickness" exclusion and claiming that Fegan's death was not caused "solely" by the accidental

knee injury.

The court concluded that:

> because the pulmonary thromboemboli and phlebothrombosis were effects of the accidental injury resulting from appropriate surgical treatment, and certainly were adverse results of medical treatment necessary properly to diagnose and treat the effects of an injury covered by a policy of accidental insurance, the resulting death is attributable to the accidental knee injury.

Id. at 400 (citation and footnote omitted).  The insurer argued that the death was not caused solely by the accidental knee injury and complications that ensued but was also caused by the malpractice, because proper medical care would have caught the condition in time and death would have been averted.  But the court rejected this argument:

> Here, the insured should not have died from a relatively simple knee injury treated in a comparatively routine way.  But he did.  Post-operative complications like phlebothrombosis and pulmonary embolism may be rare following arthroscopic surgery, but they are foreseeable, and can lead directly to the patient's death.  That medical personnel breached their duties of due care post-operatively, and could (presumably) have ... easily intervened and averted a needless death, will likely render them liable in tort, their breach having "proximately caused" the death.  But that negligent failure to properly treat the phlebothrombosis is not the type of "additional cause" contemplated by the policy language as sufficient to negate coverage.

Id. at 401 (citation omitted).

This case is distinguishable from Fegan.  The policy in this case contained a provision (not present in Fegan) excluding deaths "contributed to" by physical illness.  Thus, even if the "solely caused by" provision would not apply for the reasons stated in Fegan, the "contributed to" exclusion would apply.

Plaintiff also cites Keller v. Fortis Benefits Insurance Co., 131 Fed. Appx. 874 (3d Cir. 2005).  In that case, the insured died as a result of an accidental drowning, but the cause of the unconsciousness leading to the drowning could not be conclusively determined.  The insurer

18

denied AD&D benefits based on a "physical disease" exclusion, citing the fact that the insured had suffered a severe head injury some years before and therefore a grand mal seizure was likely the cause of his unconsciousness.  The court rejected this position, holding that there was no evidence that Keller suffered from seizures and the mere possibility that he had one did not invoke the exclusion.  Plaintiff has not explained how the <u>Keller</u> case is relevant to her claims.

Plaintiff argues that MetLife's construction of the Plan "renders the AD&D benefit provisions virtually meaningless" (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. at 7),[6] as though it would never apply because every accidental death could be said to have been "contributed to" by an individual's physical or mental illness.  MetLife indicates, however, that had Mr. Donahue died immediately upon falling from his hospital bed, his death would have been accidental and without any other contributing physical illness, as in the case of the "collapsing operating room ceiling" referred to in the <u>Senkier</u> case.  <u>See</u> Def.'s Br. Opp'n Pl.'s Mot. Summ. J. at 15.[7]  In that situation, had MetLife determined that Mr. Donahue's death was contributed to by his illness, it would have acted contrary to the express terms of the policy, but that was not the situation presented here.

Rather, following the fall, an operation was performed to evacuate a cerebral hematoma.  Mr. Donahue did well initially, but then he developed cerebral edema and reaccumulation of blood in the cerebellum, requiring a second operation.  As the pathologist stated, "[g]iven the patient's poor liver function and his coagulopathy, medical intervention was unsuccessful in stopping his intracranial bleed."  (Docket No. 32 at 101.)

---

[6]     Docket No. 33.

[7]     Docket No. 39.

19

Over the next six days, his poor liver function led to liver failure and his underlying coagulopathy resulted in additional bleeding from his stomach, upper gastrointestinal tract and bladder.  Finally, he suffered respiratory failure with possible pneumonia, his family withdrew all life support and he died.  Plaintiff has not demonstrated that MetLife's conclusion that Mr. Donahue's liver disease contributed to his death was clearly not supported by the evidence in the record.

With respect to Plaintiff's contention that MetLife ignored her requests to learn the procedures for filing an appeal and to provide additional information, it is belied by the record. The evidence demonstrates that, prior to April 2004, MetLife did not deny a claim for AD&D benefits because it had not yet received one.

In his affidavit, referring to MetLife's payment of the life benefit, Attorney Frischman recites that:

> I understood that Westmoreland Regional Hospital was reluctant to complete the application for the AD&D benefit because completing the forms to show that the cause of Mr. Donahue's death was "accidental" could be construed as an admission of its liability, and I attempted to appeal the denial of the AD&D benefit on behalf of Mrs. Donahue.

(Frischman Aff. ¶ 10.)  This paragraph is internally inconsistent: Attorney Frischman admits that no application for AD&D benefits had been submitted, yet states that he attempted to appeal the denial of the claim.  He then states that he sent a letter dated June 12, 2003 seeking information on the status of Plaintiff's AD&D claim (Frischman Aff. ¶ 11) and that he received a response dated June 26, 2003 "which confirmed receipt of my letter but stat[ed] that [MetLife] did not deny the AD&D benefit, and suggested that it would have to receive a claim from the employer claiming any AD&D benefit."  (Frischman Aff. ¶ 12.)

Despite his receipt of the June 26 letter clearly indicating that MetLife had not received and therefore had not denied a claim for AD&D benefits, Attorney Frischman sent two more letters asking for the procedure to "appeal" the denial of Plaintiff's claim for AD&D benefits. (Frischman Aff. ¶¶ 13-14.)  He then states that, in September 2003, he had a conversation with Timothy Copperwheat of MetLife, which is memorialized in a letter dated September 8, 2003, "in which I was advised that Westmoreland Regional Hospital, not Mrs. Donahue, was required to initiate the claim for the AD&D benefit."  (Frischman Aff. ¶ 15.)  He appears to suggest that this was his first notice that Westmoreland would have to file the claim, even though the June 26 and July 10 letters clearly provided this same information.

Attorney Frischman also states that, after he received the denial of benefits letter:

> I attempted to communicate with MetLife on behalf of Mrs. Donahue on multiple occasions to learn the procedures to appeal the denial for benefits, what additional information was needed to prosecute an administrative appeal, and who was responsible for conducting the "administrative review," but because no one would answer these questions, was relegated to sending a "To whom it may concern" letter dated August 2, 2004 ... to confirm her intent to appeal the denial of benefits decision.

(Frischman Aff. ¶ [22].)[8]

However, the denial of benefits letter, dated July 21, 2004, set forth the appeal procedure and asked Plaintiff to "include in your appeal letter the reason(s) you believe the claim was improperly denied, and submit any additional comments, documents, records or other information relating to your claim that you deem appropriate to allow MetLife to give your appeal proper consideration."  (Docket No. 32 at 67.)  Attorney Frischman did not submit any

---

[8]      Following paragraph 15, Attorney Frischman's affidavit continues with paragraph 12, instead of 16.  For the sake of clarity, the paragraphs are properly renumbered herein and provided in brackets.

additional information when he appealed the decision on August 2, 2004.

Finally, Plaintiff asserts that Lynn Box, the Senior Claim Approver who signed the November 4, 2004 letter upholding the denial of the claim (Docket No. 32 at 141), was the same person who made the initial benefits determination.  She bases this argument on the fact that Lynn Box is listed as the head of "Team P" (id. at 114) and the fact that the initial denial was "signed" by Team P (id. at 67).  Permitting the same individual (or the subordinate of such individual) to make both an initial claim determination and the appeal of that determination would be in violation of ERISA regulations.  See 29 C.F.R. § 2560-503.1(h)(3)(ii).

MetLife admits that Lynn Box was a member of Team P.  (Def.'s Resp. Pl.'s First Set Interrog. No. 8.)  However, it states that the initial claim denial was made by Tracey King, a Group Life Claim Examiner, and that she was not involved in the appeal.  (Def.'s Resp. Pl.'s Req. Admis. No. 2.)  Plaintiff's argument by inference is not supported by and does not withstand the record evidence submitted by MetLife.

Plaintiff has not demonstrated that MetLife's decision is clearly not supported by the evidence in the record, that it failed to comply with the procedures required by the Plan or that it failed to comply with ERISA regulations.  Therefore, with respect to Count I, Plaintiff's motion for summary judgment should be denied and Defendant's motion for summary judgment should be granted.

<u>Count II - Breach of Fiduciary Duty</u>

Defendant argues that Plaintiff's claim of a breach of fiduciary duty claim under § 502(a)(3) is foreclosed by the availability of a claim for denial of benefits under § 502(a)(1)(B).  Plaintiff argues that she has only requested relief under § 502(a)(3) if the Court holds that relief

is unavailable on Count I.  She contends that the evidence shows, at the very least, that there are genuine issues of material fact regarding her claim, in that MetLife repeatedly represented that it would pay the AD&D benefit if Westmoreland checked the box for it on the application and provided a death certificate stating that the cause of death was accidental.

> ERISA provides that a claim may be brought:

> by a participant, beneficiary or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan...

29 U.S.C. § 1132(a)(3).

A beneficiary can state a claim for breach of fiduciary duty pursuant to § 1132(a)(3)(B). To state a claim under this subsection, a plaintiff must allege that: 1) the defendant is an ERISA fiduciary; 2) the defendant made a misrepresentation; 3) the misrepresentation was a material one; and 4) the plaintiff detrimentally relied on the misrepresentation.  Burstein v. Retirement Account Plan for Employees of Allegheny Health Educ. & Research Found., 334 F.3d 365, 384 (3d Cir. 2003) (citation omitted).

Plaintiff contends that MetLife misrepresented that it would pay the AD&D benefit if it received an application requesting it and an amended death certificate stating that the cause of death was "accidental."  MetLife responds that it never made such a representation.

Attorney Frischman cites the June 12, 2003 email message from Mary Rapsky to Laurie English, contending that it constitutes an example of MetLife representing to Westmoreland what the procedure was for an appeal but that it did not follow through on its representation. However, as noted above, what is cited is a response to a question that is not in the record.  There is no record evidence that MetLife denied a request for AD&D benefits on or before June 12,

23

2003.  Rather, the only evidence in the record is that the request for AD&D benefits was submitted on April 15, 2004 and denied on July 21, 2004.

Attorney Frischman also cites October 6, 2003 letter, in which MetLife confirmed receipt of the autopsy report, indicated that it understood that there was pending litigation between Plaintiff and Westmoreland and concluded: "Should the end result be the manner of his death [is] ruled accidental, we will then pursue accidental benefits with the employer."  (Frischman Aff. ¶ [16].)  He continues: "Based on the October 6, 2003 letter and my conversations with Westmoreland Regional Hospital, I understood that MetLife would pay the accidental death benefit upon receipt of an Amended Death Certificate listing Mr. Donahue's death as 'accidental.'" (Frischman Aff. ¶ [17].)

Contrary to Plaintiff's contention, the October 6 letter does not state that MetLife would pay the AD&D benefit upon receipt of an amended death certificate.  On the other hand, it also does not state that MetLife would merely accept an AD&D claim for processing, as MetLife contends.  What it states is that MetLife would "pursue" accidental benefits with Westmoreland, a representation that suggests a more active role than MetLife actually took.

Plaintiff also cites deposition testimony from three representatives of Westmoreland. Mary Harrison stated that she understood that MetLife would pay the claim once it received the amended death certificate.  (Harrison Dep. at 9-10, 12.)[9]  When asked the basis for her understanding, she replied that it was "[b]ased on the fact that when I had originally talked to Pat Lupia when I filed the first claim, that she stated nothing could be paid accidental unless it was marked that way on the death certificate."  (Id. at 12.)

---

[9]      Docket No. 29 Ex. B.

Laurie English, Director of Human Resources for Westmoreland, testified that her understanding was based on:

> our previous cases with MetLife, that has always been what we had to do when we processed anything.  And in fact, Mary Harrison had a conversation with MetLife also, and they said they go by the death certificate.  So you have to do according to the death certificate.  They would not consider anything else.

(English Dep. at 14-15.)[10]  See also id. at 17-18 ("they told us that the box had to be checked on the application or they wouldn't even consider it, plus the death certificate must state accidental.")

She stated that Westmoreland "had other cases in the past where we have had accidental death and that has been the process that MetLife instructed us to do, and we have always followed that process."  (Id. at 16.)  She states that AD&D benefits were paid in those other cases.  (Id.)

Carol Bucci, Chief Legal Officer and General Counsel for the parent company to Westmoreland, testified that she had a phone conversation with a MetLife representative named Jessica on March 1, 2004 and that:

> the context of this conversation was that this was the result of my personally calling MetLife to determine what was needed in order to successfully process this as an accidental death claim, and Jessica indicated that these were the two elements necessary in order to have MetLife grant the accidental death benefit.

(Bucci Dep. at 14.)[11]  See Dep. Ex. 9.  Bucci stated that, based upon this understanding, Westmoreland and Plaintiff resolved the negligence claim by entering into a settlement and release.  (Id. at 15-16.)

---

[10]     Docket No. 29 Ex. C.

[11]     Docket No. 29 Ex. D.

MetLife contends that Westmoreland's representatives were only told that, in order for MetLife to even process an AD&D claim, the death certificate had to say that death was caused by an accident, not that it would pay the claim if the documentation was provided. However, Westmoreland's representatives testified that they were told that MetLife would pay the claim, not just process it, if the documentation was provided. Plaintiff has adduced sufficient evidence on the issue of whether misrepresentations were made.

However, her breach of fiduciary duty claim fails because she has not and cannot demonstrate detrimental reliance. Plaintiff argues that she detrimentally relied on MetLife's assurance that it would pay the AD&D benefit when she settled her negligence action against Westmoreland. However, the settlement agreement and release, to which MetLife is not a party, explicitly contemplated the possibility that MetLife might not pay the claim for AD&D benefits. In releasing Westmoreland from any claims arising out of Mr. Donahue's death, the document explicitly indicated that:

> Nothing contained in this provision shall be construed to constitute the release of any claims by Holly Donahue either individually or as the Executrix of the Estate of Dennis Donahue against the Metropolitan Life Insurance Company until it has paid its contribution to the proceeds being paid in consideration for this Release.

(Dep. Ex. 10 at 1 n.*.) In other words, the release provided that, if MetLife did not pay the AD&D benefit, Plaintiff could bring an action against MetLife, which is what has occurred.

Plaintiff has not explained how the settlement agreement demonstrates her detrimental reliance upon MetLife's misrepresentations. If the release had provided that Westmoreland would pay $84,500 in the event that MetLife refused to pay the AD&D claim and Westmoreland refused to do so, or if it had provided that the settlement would be voided in the event that MetLife refused to pay the claim, Plaintiff would have suffered monetarily as a result of the

events that transpired.  The release did not provide for these contingencies.

Rather, it stated that Westmoreland would pay Plaintiff $25,000 of its own funds and $90,000 from its insurer.  The release indicated that Plaintiff expected to receive $84,500 from MetLife in payment of an AD&D claim, but such a claim had not yet been filed, MetLife was not a party to the agreement and the release indicated that Plaintiff could commence suit against MetLife if it did not pay.  Thus, even assuming that MetLife made the representations Plaintiff cites, she has not demonstrated that she suffered harm as a result of its failure to pay.

Moreover, the Supreme Court has held that monetary damages are not available under § 1132(a)(3)(B), which refers to "equitable relief."  Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204 (2002).  Plaintiff's primary demand for relief is monetary damages for AD&D benefits to which she alleges she is entitled.  The equitable relief Plaintiff requests is "disgorgement of unjust enrichment and a mandatory injunction compelling Defendant MetLife to pay the accidental death benefit, to enforce Plaintiff's rights under the terms of the AD&D Plan, to award interests, costs and fees as allowed by law, and to award all such other and further relief as this Court deems just and proper." (Compl. at 8 ad damnum cl. Count II.)  However, the Supreme Court has held that "an injunction to compel the payment of money past due under a contract, or specific performance of a past due monetary obligation, was not typically available in equity."  Knudson, 534 U.S. at 210-11.

"Where Congress otherwise has provided for appropriate relief for the injury suffered by a beneficiary, further equitable relief ought not to be provided."  Ream v. Frey, 107 F.3d 147, 152 (3d Cir. 1997).  Plaintiff had an avenue of relief pursuant to § 502(a)(1)(B) and she availed herself of it.  Unfortunately, under the facts of this case, she cannot recover AD&D benefits

because MetLife's denial of the claim was not clearly contrary to the terms of the Plan. However, this does not mean that Plaintiff can proceed with a claim for breach of fiduciary duty, particularly when she has failed to point to evidence in support of such a claim. Therefore, with respect to Count II, Plaintiff's motion should be denied and Defendant's motion should be granted.

<u>Count III – Equitable Estoppel</u>

In Count III, Plaintiff alleges a claim of equitable estoppel against MetLife. MetLife argues that Plaintiff cannot meet the requirements for such a claim.

To succeed on an equitable estoppel claim, a plaintiff must establish: 1) a material misrepresentation; 2) reasonable and detrimental reliance upon the representation; and 3) extraordinary circumstances. <u>Burstein</u>, 334 F.3d at 383 (citation omitted).

As explained above, Plaintiff may be able to point to the existence of misrepresentations by MetLife representatives regarding payment of AD&D benefits if she provided an amended death certificate, but she cannot establish reasonable and detrimental reliance upon these representations. Moreover, to establish "extraordinary circumstances," a plaintiff must show: "acts of bad faith on the part of the employer, attempts to actively conceal a significant change in the plan, or commission of fraud." <u>Burstein</u>, 334 F.3d at 383 (citations omitted). Plaintiff contends that extraordinary circumstances are demonstrated by MetLife's repeated promises to pay the AD&D benefit if she provided an amended death certificate. However, this argument goes to the first and second elements of the claim, which are insufficient for the reasons explained above, not the third element. The record does not support Plaintiff's claim of equitable estoppel. Therefore, with respect to Count III, Plaintiff's motion should be denied and

Defendant's motion should be granted.

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of the defendant (Docket No. 25) be granted.  It is further recommended that the motion for summary judgment submitted on behalf of the plaintiff (Docket No. 27) be denied.  It is further recommended that the Motion to Strike Exhibits Submitted With Plaintiff's Motion for Summary Judgment, submitted on behalf of the defendant (Docket No. 36), be denied.

Within ten (10) days of being served with a copy, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

Dated: March 29, 2006

29